EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| v. | ) CRIMINAL ACTION<br>) NO. 04-1809-CBS |
| JOSE MELO AND JOSEPH ALLEN, ET AL.,<br>Defendants, | ) |

DOCKETED

MEMORANDUM OF PROBABLE CAUSE AND
ORDER OF DETENTION
July 12, 2004

SWARTWOOD, M.J.

I. <u>Nature of the Offense and the Government's Motion</u>

On June 29, 2004, a Criminal Complaint was filed, charging multiple individuals, including Jose Melo ("Mr. Melo") and Joseph Allen ("Mr. Allen")(collectively "Defendants"), with conspiracy to distribute oxycodone, a Schedule II controlled substance, and knowingly and intentionally distributing oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§846 and 841(a)(1).

At these Defendants' initial appearance on June 30, 2004, they were advised of their right to a preliminary examination in accordance with Fed. R. Crim. P. 5.1 and the Government moved for a detention hearing in accordance with 18 U.S.C.

§§3142(f)(1)(C)(Defendants are charged with an offense for which a maximum term of imprisonment of ten years or more is prescribed in the "Controlled Substances Act"), and (f)(2)(A)(risk of flight).

A consolidated probable cause/detention hearing was held on July 2, 2004 and at this hearing, Steven Story, Special Agent with the Drug Enforcement Administration, testified on behalf of the Government and was cross-examined by Defendants' counsel.

II. Findings of Fact

1. Special Agent Story is the case agent in connection with an investigation concerning the distribution of oxycodone in the North Shore area of Massachusetts. This investigation commenced in October 2003 and concluded on June 30, 2004 with the arrest of more than thirteen Defendants. During this investigation, Special Agent Story and other law enforcement officials involved in this investigation, used confidential informants, undercover agents, surveillance of individuals and locations, pen register/trap and trace devices and recorded and monitored controlled purchases of oxycodone.

2. Over a several month period from October 29, 2003 to June 10, 2004, five undercover law enforcement agents ("UC's") established themselves as purchasers (and possible suppliers) of substantial amounts of oxycodone in the Gloucester, Massachusetts area. During this period, in sixteen separate transactions, the

UC's purchased more than eleven hundred 80 mg OxyContin tablets[1]. Gov't Ex. 1.

3.  On June 7, 2004, one of the UC's made arrangements to purchase 100 OxyContin tablets from Joseph Baldassano, an individual from whom other UC's had previously made multiple purchases of OxyContin tablets. Id.  Mr. Baldassano agreed to meet the UC as Steve's Restaurant ("Steve's") in Gloucester. Id.

4.  Prior to the UC arriving at the restaurant, Mr. Baldassano attempted to cancel the transaction because he had observed numerous police in the area. At this time, Mr. Baldassano was observed alone inside the restaurant by law enforcement agents. Simultaneously, law enforcement agents saw Mr. Allen get out of a vehicle across from Steve's.  Mr. Allen then went inside the restaurant, looked around and walked back out.  Mr. Allen made no contact with Mr. Baldassano.  Mr. Allen then positioned himself in front of Steve's and watched the traffic. Id.

5.  Mr. Baldassano left the restaurant, walked past Mr. Allen without making contact and continued walking toward Washington Street.  Mr. Allen then used the pay phone outside of Steve's to make a phone call.  While making the call, Mr. Allen looked in Mr. Baldassano's direction.  At this same time, Mr. Baldassano answered a call on his cellular telephone. After completing the call, Mr.

---

[1]OxyContin is a brand name for oxycodone.

Allen walked across the street to the train station and appeared to surveil the area. Id.

6.  Mr. Baldassano, who was walking on Washington Street, then called the UC and told him to pick him up on a side street. Thereafter, Mr. Allen departed the train station and walked up Washington Street some distance behind Mr. Baldassano. After the UC turned onto the side street indicated by Mr. Baldassano and met up with him, Mr. Baldassano entered the rear passenger seat of the UC's vehicle. Mr. Baldassano told the UC not to go near the restaurant and that they had to pick up Joey Allen and then they could go to the "dude's house" in Peabody (and, presumably, get the pills). Id.

7.  Mr. Allen was seen walking to the corner of Gloucester and Washington Streets, where he sat on a stone wall and looked towards Mr. Baldassano's house which was located on Washington Street. Id.

8.  Ultimately, Mr. Baldassano had the UC proceed towards Peabody without picking up Mr. Allen. During the drive, Mr. Allen called Mr. Baldassano on his cell phone and Mr. Baldassano was overheard telling Mr. Allen that Messrs. Cream and Matthews[2] would be picking him up in front of his [Baldassano's] house, where he [Baldassano] had told Mr. Allen to be. Mr. Allen was picked up by

---

[2] Mr. Cream had previously been present and/or participated in two transactions during which UC's purchased OxyContin tablets. Mr. Matthews had previously been arrested and after being advised of his *Miranda* rights, Mr. Matthews admitted to being a distributor of oxycodone in the Gloucester area.

4

a green Jeep Cherokee driven by Mr. Matthews and in which Mr. Cream was a passenger. The Jeep Cherokee then proceeded towards Peabody. Id.

9. Mr. Baldassano directed the UC towards a residence at 20 Tracey Street in Peabody, Massachusetts ("20 Tracey Street"). Mr. Melo resides at 20 Tracey Street  As the vehicle approached 20 Tracey Street, Mr. Baldassano told the UC that "this dude runs for my dude". Id.

10. Upon arriving at 20 Tracey Street, Mr. Baldassano went into the residence, returned to the UC's vehicle, got back inside and handed the UC a bag containing what appeared to be 100 80 mg OxyContin tablets in return for $5,200. Mr. Baldassano then returned to 20 Tracy Street and was observed with Mr. Melo. Thereafter, the Jeep Cherokee with Messrs. Mathews, Allen and Cream inside pulled up in front of 20 Tracey Street and picked up Mr. Baldassano. The four individuals then returned to Gloucester. Id.

11. In prior transactions in which an UC met Mr. Baldassano in public places to complete a deal, Mr. Baldassano was accompanied by individuals who appeared to engage in counter-surveillance of the area. Id.

12. On June 10, 2004, the same UC involved in the June 7, 2004 transaction contacted Mr. Baldassano and indicated that he was ready to purchase 500 OxyContin tablets. Mr. Baldassano indicated

5

that he would call his source and confirm the deal. Thereafter, it was agreed to meet that day to complete the deal. Id.

13. That afternoon, the UC picked Mr. Baldassano up in Lowell. Eventually, it was determined that the deal would take place at the 99 Restaurant in Danvers. While the deal was being arranged, the UC asked Mr. Baldassano whether his source was "cool" and Mr. Baldassano responded that he had been obtaining OxyContin from this source for five or six years. Id.

14. After the UC and Mr. Baldassano arrived at the 99 Restaurant in Danvers, Mr. Melo was observed leaving 20 Tracey Street and traveling to that same restaurant. After talking to Mr. Baldassano on his cell phone, Mr. Melo entered the 99 Restaurant and was introduced to the UC. The UC and Messrs. Melo and Baldassano then agreed that the deal would be conducted in the parking lot and discussed how it would be completed. Id.

15. Once in the parking lot, Mr. Melo got into his vehicle and was joined by Mr. Baldassano. Mr. Melo handed a plastic bag to Mr. Baldassano, who then got out of the vehicle, got into the UC's vehicle and displayed the bag containing the OxyContin tablets to the UC. Id.

16. The UC then contacted another UC (who was described to Mr. Baldassano as the first UC's girlfriend) who arrived with $24,000 in cash which was given to Mr. Baldassano in exchange for the plastic bag containing what appeared to be 500 80 mg OxyContin

6

tablets. Eventually, Mr. Baldassano got out of the UC's vehicle and got back into Mr. Melo's vehicle and they drove away. Mr. Melo then dropped Mr. Baldassano off at a mall, where he was later picked up by Messrs. Cream and Allen.

17. The 600 tablets purchases by the UC in these two transactions have been sent to a laboratory for analyses. In both transactions, the tablets purchased by the UC were consistent with OxyContin tablets in that they were greenish-blue, round-shaped tablets with an "80" on one side and "OC" on the other side.

### III. Probable Cause

I find probable cause for the offense charged in this Complaint against Messrs. Allen and Melo. The Government has presented substantial evidence that Mr. Melo participated in two transactions in which he was the source of six hundred OxyContin tablets purchased by an UC.

The evidence against Mr. Allen is circumstantial and based on inference. Mr. Allen's counsel argues that Mr. Allen's mere presence at the June 7, 2004 transaction site(s) is, as a matter of law, insufficient to establish probable cause to believe that he was a member of the drug conspiracy.

The evidence shows that Mr. Allen, who knew Mr. Baldassano, appeared at a restaurant where Mr. Baldassano was preparing to meet an UC to arrange a drug transaction. Thereafter, the actions of Messrs. Allen and Baldassano are consistent with Mr. Allen engaging

in counter-surveillance of the area and informing Mr. Baldassano that there appeared to be law enforcement officials in the area. Thereafter, Mr. Baldassano indicates to the UC that they would go to Peabody to obtain the drugs and they would pick up Mr. Allen before proceeding to Peabody to complete the transaction. Mr. Allen was not picked up by the UC and Mr. Baldassano. Instead, Mr. Baldassano was overhead by the UC telling Mr. Allen that he would be picked up by two other alleged members of this conspiracy at the location where he [Baldassano] had previously told him to be. After being picked up, Mr. Allen and these two other individuals proceeded to 20 Tracey Street and picked up Mr. Baldassano, immediately after he had concluded a drug transaction with Mr. Melo and the UC.

I agree with counsel for Mr. Allen that if the standard applied at this stage were proof beyond a reasonable doubt, it is questionable whether the evidence before me would be sufficient to find that Mr. Allen was a member of this conspiracy. However, at this stage of the proceedings, the Government has met its burden of establishing that there exists probable cause to believe that Mr. Allen was not merely present at the June 7, 2004 transaction, rather he was there acting as counter-surveillance for Mr. Baldassano. That is, there exists probable cause to believe that Mr. Allen's conduct during this transaction amounted to more than a momentary, random or innocent association with Mr. Baldassano.

8

IV.   The Bail Reform Act

  A.   Discussion of the Bail Reform Act

Under 18 U.S.C. § 3142 ("The Bail Reform Act" or "the Act"), the judicial officer shall order that, pending trial, the Defendant be (1) released on his own recognizance or upon execution of an unsecured bond; (2) released on a condition or combination of conditions; (3) temporarily detained to permit revocation of conditional release, deportation, or exclusion; or (4) detained. 18 U.S.C. § 3142(a). Under the Act, the judicial officer may detain a person pending trial only if, after a detention hearing held pursuant to 18 U.S.C. § 3142(f), the judicial officer determines that "no condition or combination of conditions [set forth under 18 U.S.C. § 3142 (b) or (c)] will reasonably assure the appearance of the person as required and the safety of any other person and the community". 18 U.S.C. § 3142(e).  The Supreme Court, in United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095(1987) has cautioned that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Id. at 755, 107 S.Ct. at 2105. For this reason, the Defendant may be detained only if the judicial officer finds by (1) clear and convincing evidence, that the Defendant is a danger to the community, or (2) a preponderance of the evidence, that the Defendant poses a risk of flight. See 18 U.S.C. § 3142 (f); United States v. Jackson, 823 F.2d 4-5 (2d Cir. 1987); United

9

States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. (1986), cert. denied, 479 U.S. 978, 107 S.Ct. 562 (1986). See also United States v. Patriarca, 948 F.2d 789, 792-93 (1st Cir. 1991). Furthermore, the judicial officer "may not impose financial condition that results in the pretrial detention of the person". 18 U.S.C. § 3142 (c).

The Bail Reform Act establishes a two step procedure for making the determination that the Defendant should be detained. First, the Government is entitled to move for detention where the Defendant has been charged with one of the offenses enumerated in the statute for which Congress has determined that detention is warranted. See 18 U.S.C. § 3142 (f)(1). The Government may also move for detention, or the judicial officer may on his or her own motion move for detention, where the case involves a serious risk that the Defendant will flee or that the Defendant will obstruct or attempt to obstruct justice. 18 U.S.C. § 3142(f)(2). Second, the judicial officer must determine whether any condition or combination of conditions will adequately ensure the appearance of the Defendant and the safety of the community against any danger posed by the Defendant's pretrial release. See United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).

In meeting its burden on the issue of whether any condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the

10

community, the Government is aided by the statutory presumptions created by 18 U.S.C. 3142(e). Where the offense charged is one of the offenses enumerated in Section 3142(f)(1), Section 3142(e) creates the rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of the community if the judicial officer finds that: (1) the Defendant has been convicted of a federal offense that is described in Section 3142(f) or an offense under state law that would have been an offense described in Section 3142(f)(1) if federal jurisdiction had existed, (2) such offense was committed while the person was on release pending trial for a federal, state or local offense, and (3) a period of not more than five years has elapsed since the date of conviction or release from imprisonment for such offense. Section 3142(e) also creates the rebuttable presumption that no condition or combination of conditions will ensure the safety of the community and the appearance of the Defendant if the judicial officer finds that there is probable cause to believe that the Defendant committed an offense: (1) for which a maximum term of imprisonment of ten years or more is prescribed (a) in the Controlled Substances Act, (b) the Controlled Substances Import and Export Act, or (c) the Maritime Drug Enforcement Act; or (2) under 18 U.S.C. § 924(c). In order to rebut either presumption, the Defendant must produce "some evidence" to the contrary. United States v. Jessup, 752 F.2d 378, 384 (1st Cir. 1985).

11

In making the determination as to whether "any condition or combination of conditions will reasonably assure the appearance of the [Defendant] as required and the safety of any other person and of the community", the judicial officer is compelled to consider the following factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including:

    a. the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    b. whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and

(4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).

V.  Discussion of Whether Detention is Warranted

A. History and Characteristics

1. Mr. Melo

Mr. Melo was born on January 15, 1976, in Portugal. Mr. Melo, who is a legal permanent resident, moved to the United States with his family when he was thirteen years old. Mr. Melo graduated from Peabody High School in 1995.

Mr. Melo has resided with his father, mother and only sibling at 20 Tracey Street in Peabody, Massachusetts for the past three years. For approximately twelve years prior to that, the family lived at another address in Peabody. Mr. Melo visited Portugal in 2003 for a vacation.

For the past five to six years, Mr. Melo has been self-employed as a plaster worker. In addition, two years ago Mr. Melo worked for a plaster company in Peabody.

Mr. Melo's prior criminal record, which is minimal, includes convictions for uttering, knowingly receiving stolen property, larceny[3] and shop lifting.

2. Mr. Allen

Mr. Allen was born on May 30, 1978, in Beverly, Massachusetts and has been a life-long resident of the Gloucester, Massachusetts area. For the past five years Mr. Allen has resided in Gloucester

---

[3] These three convictions, which arise out of the same occurrence, were originally continued without a finding for a one year probationary period. However, Mr. Melo violated the terms of his probation.

13

with his girlfriend in the basement level of a residence owned by her parents.

Mr. Allen's father is deceased. Mr. Allen's mother and three of his six siblings reside in Gloucester. Mr. Allen also has a brother residing in New Bedford, Massachusetts, a brother who resides in Everett, Massachusetts, and a sister who resides in Maine.

Mr. Allen has been in a relationship with his present girlfriend for the past six years and she is expecting their first child in October.

Mr. Allen attended Gloucester High School through the tenth grade and received his GED in 2000. Mr. Allen is currently unemployed. Mr. Allen has previously been employed for short periods of time by a paving company, an electric company and on a fishing boat.

Mr. Allen has a significant prior criminal record including seven convictions for assault and battery. Mr. Allen also has convictions for malicious destruction of property, knowingly receiving stolen property, possession of a Class D Substance and being a disorderly person (six convictions). In addition, Mr. Allen has been the subject of a civil restraining taken out by his sister.

Victim and witness statements relating to assaults committed by Mr. Allen indicate that one victim was beaten so badly, he had

14

to undergo reconstructive surgery to his face (which included the installation of metal plates in his face). <u>Gov't Ex. 5</u>. On at least two occasions, Mr. Allen has assaulted individuals for no apparent reason (one of victims apparently looked towards Mr. Allen who was creating a disturbance and thereafter, was beaten). <u>Gov't Exs. 2&5</u>.

B.  <u>Nature of the Offense and Weight of the Evidence</u>

### 1. <u>Mr. Melo</u>

I have previously found probable cause for the offense charged against Mr. Melo in this Complaint. The Government has presented substantial evidence that Mr. Melo was the source of 600 80 mg tablets of OxyContin sold to an UC. The two transactions in which Mr. Melo participated were surveilled and may have been video taped. Therefore, I find that the weight of the evidence against Mr. Melo is substantial.

### 2. <u>Mr. Allen</u>

While I have found probable cause for the offense charge against Mr. Allen in this Complaint, the Government's case against him is based on circumstantial evidence and inference. Under these circumstances, I find the weight of evidence against Mr. Allen to be less than substantial.

C.  <u>Rebuttable Presumption</u>

The United States has moved for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(C) and (f)(2)(A). The Government must prove that there is no condition or combination of conditions that would

reasonably assure the safety of any other person or the community if Messrs. Melo and Allen were released, or the appearance of Messrs. Melo and Allen as required.

The rebuttable presumption created by 18 U.S.C. § 3142(e) applies in this case because Messrs. Melo and Allen are charged with a drug offense for which a maximum penalty of ten years or more is prescribed in the Controlled Substances Act. I have found probable cause exists for the offense charged against Messrs. Melo and Allen in the Complaint. Therefore, I find that under 18 U.S.C. §3142(e), there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of Messrs. Melo and Allen or the safety of the community if they were released. I further find that neither Mr. Melo nor Mr. Allen has produced or proffered any credible evidence on his own behalf to rebut this presumption. Without such evidence, the presumption alone may justify detention. <u>United States v. Alatishe</u>, 768 F.2d 364, 371 (D.C. Cir. 1985); <u>United States v. Vires</u>, 637 F. Supp. 1343, 1351 (W.D.Ky. 1986). Although I have determined that Messrs. Melo and Allen have failed to rebut the presumption, for the sake of completeness, I will examine the Government's assertion that Messrs. Melo and Allen pose a danger to the community and a risk of flight.

D. <u>Whether Messrs. Melo and Allen Pose A Danger to the Community</u>

1. <u>Mr. Melo</u>

The Government has presented overwhelming evidence that Mr. Melo is a source for large amounts of OxyContin tablets. In a short period of time, Mr. Melo was able to provide the UC with 600 80 mg OxyContin tablets, including 500 tablets in one transaction. Furthermore, Mr. Baldassano identified Mr. Melo as a long time supplier of oxycodone (albeit, a supplier who was a middleman rather than the top source). At the same time, Mr. Melo does not have a substantial criminal record and no record of prior convictions for drug dealing or crimes of violence. Therefore, I am relying on the rebuttable presumption to detain Mr. Melo on dangerousness grounds.

2. <u>Mr. Allen</u>

Mr. Allen has multiple prior convictions for assault and battery and being a disorderly person and one prior conviction which is a drug offense. On multiple occasions, Mr. Allen has assaulted individuals for no apparent reason and on one of these occasions, the victim required reconstructive surgery to his face. Mr. Allen's sister has previously obtained a civil restraining order against Mr. Allen. Furthermore, Mr. Allen has a lengthy history of violating the terms of his probation. Mr. Allen is unemployed and, at best, has a spotty employment history.

This is a difficult case in that I found the evidence against Mr. Allen to be less than substantial. At the same time, Mr. Allen is clearly a violent individual who poses a significant risk to the community. Given Mr. Allen's propensity to violate the terms of his probation and the nature of the offenses previously committed by him, including a prior drug conviction and multiple convictions for assault and battery, I find by clear and convincing evidence that there are no conditions or combination of conditions that would assure the safety of the community if Mr. Allen were released.

F. Whether Messrs. Melo and Allen Pose A Risk Of Flight

1. Mr. Melo

Mr. Melo is a legal permanent resident who has lived in this country since he was thirteen. Mr. Melo's immediate family all live in Massachusetts. At the same time, Mr. Melo has recently visited Portugal. Furthermore, because of the amount of drugs involved and his alleged role as a supplier in this conspiracy, Mr. Melo, who has never served any time, faces a significant sentence if convicted of the offenses with which he has been charged in this Complaint. Mr. Melo is also facing almost certain deportation if convicted of the offenses charged. Therefore, considering the strength of the Government's case against Mr. Melo, the substantial sentence Mr. Melo faces in this case if he is found guilty and the fact that he faces almost certain deportation after serving a

sentence, I find by a preponderance of the evidence that Mr. Melo poses a risk of flight and that there are no conditions or combination of conditions that I may impose that would assure his appearance in Court as directed.

### 2. Mr. Allen

Mr. Allen is a lifelong resident of the Gloucester area and all of his immediate family live on the Northeast Coast (most in the Gloucester area). Mr. Allen's girlfriend of six years is expecting their first child in October. Furthermore, although Mr. Allen has a significant criminal history, his record reflects that he appears in court when required. Under the totality of these circumstances, I cannot find by a preponderance of the evidence that Mr. Allen poses a risk of flight and I decline to hold him on this ground.

### VI. Order of Detention Pending Trial

In accordance with the foregoing memorandum,
IT IS ORDERED:

1. That Messrs. Melo and Allen be committed to the custody of the Attorney General or his designated representative, for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That Messrs. Melo and Allen be afforded a reasonable opportunity for private consultation with counsel; and

3. On order of a court of the United States or on request by an attorney for the Government, the person in charge of the corrections facility in which Messrs. Melo and Allen are detained and confined shall deliver them to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

RIGHT OF APPEAL

THE PERSON OR PERSONS DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).

/s/Charles B. Swartwood, III
CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE