```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )   Criminal No. 04-1809-CBS
        v.                    )
                              )
JOSEPH ALLEN,                 )
    Defendant                 )
                              )
```

## Government's Memorandum In Opposition To Defendant's Motion To Revoke Detention Order

### Introduction

The United States of America, by Michael J. Sullivan, United States Attorney, and Michael J. Pelgro, Assistant U.S. Attorney, hereby files this memorandum in opposition to the defendant's motion to revoke detention order in the above-captioned action. As set forth more fully below, the defendant failed to present any credible evidence to rebut the statutory presumption against pretrial release and the government presented substantial evidence demonstrating that the defendant posed a substantial risk of danger to the community if released. Accordingly, this Court should not revoke the carefully-thought out detention order prepared by United States Magistrate Judge Charles B. Swartwood, III after a day-long evidentiary hearing.

A copy of Magistrate Judge Swartwood's Memorandum Of Probable Cause And Order Of Detention, dated July 12, 2004, is attached hereto as Exhibit A. A copy of the criminal complaint and the supporting affidavit of DEA Special Agent Steven C. Story is attached hereto as Exhibit B.

**Background And Procedural Posture**

From October 2003 through June 2004, the Drug Enforcement Administration ("DEA") conducted an investigation of widespread trafficking in OxyContin on the North Shore centered in Gloucester.[1] During that time, multiple DEA undercover agents purchased thousands of OxyContin pills from a variety of drug dealers in the Gloucester area, ranging from street-level dealers to wholesale traffickers who sold hundreds of pills at a time. The most prolific OxyContin distributor in Gloucester was a resident named Joseph Baldassano ("Baldassano"), who regularly supplied other dealers with pills, who had other defendants in this case selling his pills to DEA undercover agents, and who then engaged in large transactions directly with a DEA undercover agent.[2]

---

[1] OxyContin is a brand name for oxycodone, a Schedule II controlled substance, that is a synthetic opiate prescribed by physicians to manage long-term pain. It comes in pill form, the strongest dosage being 80 milligrams, that contains a time-release mechanism so that a patient can get pain relief over time without constantly taking pills. Drug users have determined a way to defeat the time-release mechanism so that users can get a "high" consistent with heroin. The use and abuse of OxyContin is widespread in eastern Massachusetts, particularly on the North Shore, and has led to overdoses and increased emergency-room admissions, an increase in crime, and an increase in the use of heroin (users often switch from the more expensive OxyContin to the cheaper heroin). All of the pills purchased by DEA undercover agents in this case contained 80 milligrams of oxycodone.

[2] Defendant Joseph Baldassano has been ordered detained by Magistrate Judge Swartwood.

2

On various occasions during the investigation, defendant Joseph Allen ("Allen") was observed or mentioned. For example, on January 6, 2004, two associates of Baldassano - defendants James Gardner and Keith Behsman - sold 100 OxyContin pills to undercover agents for $5,300 ($53 per pill); after the deal, Gardner and Behsman traveled together to Gardner's house and then to a meeting with Allen and another person in the parking lot of a convenience store. See Ex. B at ¶¶ 40-47. On a later occasion, a street-level dealer - defendant Giuseppe Torrente - claimed that he had been "ripped off" by Allen. See Ex. B at ¶ 68.

On June 7, 2004, a DEA undercover agent made arrangements with Baldassano to purchase 100 OxyContin pills from him for $5,200 ($52 per pill). As set forth in Special Agent Story's affidavit, see Ex. B at ¶¶ 105-108, as testified to extensively by Special Agent Story at the detention hearing, and as credited by Magistrate Judge Swartwood, see Ex. A at pp. 3-5, Allen was observed acting in concert with Baldassano to engage in counter-surveillance at the location in Gloucester where the sale was supposed to occur. As a result of these actions, Baldassano detected the presence of law enforcement and, as a result, had the undercover agent pick him up at a nearby location and drive him to Peabody to do the deal.

Baldassano directed the undercover agent to pick up Allen (who was waiting near Baldassano's house) but then changed his mind and had the undercover agent drive directly to Peabody to do the deal. See Ex. A at p. 4; Ex. B at ¶¶ 106-112.[3] During the drive, Allen called Baldassano, who instructed Allen to wait there as he would have defendants Jason Matthews and Matthew Cream pick him up and drive him over to the Peabody location where the deal was to occur. See Ex. A at pp. 4-5; Ex. B at ¶ 112.[4] Surveillance agents then observed Allen being picked up by Matthews and Cream.

During the drive, Baldassano told the undercover agent that Allen "is moving up to Lowell with me because he got kicked out of his house" and, in response to an inquiry from the undercover agent, indicated that Allen was "cool" (i.e., was involved in the OxyContin dealing).[5] Special Agent Story testified at the detention hearing that Allen was "kicked out" of his residence by his girlfriend due to his drug use.

---

[3] It is government counsel's memory that Special Agent Story testified that Baldassano c

[4] Defendants Matthews and Cream were associates of Baldassano who were involved in the ongoing distribution of OxyContin pills. See Ex. B at ¶¶ 53-59, 61-66, 71-75.

[5] Baldassano is from Gloucester but maintained an apartment in Lowell because he was a student at the University of Massachusetts in Lowell.

Baldassano directed the undercover agent to drive to the Peabody residence of defendant Jose Melo, a supplier to Baldassano. Baldassano entered Melo's residence, came out, and did the 100-pill deal in Melo's driveway. *See* Ex. A at p. 5; Ex. B at ¶¶ 113-116. After the deal, Baldassano was observed meeting with Melo and then being picked up by Allen, Cream, and Matthews. *See* Ex. A at p. 5; Ex. B at ¶ 115.

On June 10, 2004, Baldassano and Melo sold 500 OxyContin pills to the undercover agent for $24,000 ($48 per pill). *See* Ex. A at pp. 5-7; Ex. B at ¶¶ 117-125. This sale occurred in the parking lot of a restaurant in Danvers. After the deal, Melo dropped off Baldassano at the North Shore Mall, where he was picked up by Allen, Cream, and another male. *See* Ex. A at pp. 6-7; Ex. B at ¶ 124.

Special Agent Story testified that, on June 29, 2004, the undercover agent made arrangements to purchase another 500 OxyContin pills from Baldassano. Surveillance agents then observed Baldassano, Allen, and two other defendants driving together throughout Gloucester. The agents later stopped the vehicle and arrested Baldassano, Allen, and the other two defendants.

At Allen's initial appearance on June 30, 2004, the government moved for detention. Magistrate Judge Swartwood conducted a consolidated probable cause/detention hearing on July

2, 2004. At the hearing, Special Agent Story testified extensively and the government introduced as exhibits records relating to Allen's criminal history. Magistrate Judge Swartwood took the matter under advisement.

On July 12, 2004, Magistrate Judge Swartwood issued his 20-page decision with respect to Allen and Melo. In the decision, the Magistrate Judge observed that Allen has a "significant prior criminal record including seven convictions for assault and battery" as well as six other convictions and that his crimes of violence involved beating persons "badly" and for no apparent reason. See Ex. A at pp. 14-15. The Magistrate Judge went on to observe that Allen has a "lengthy history of violating the terms of his probation," is currently unemployed, and "has a spotty employment history." See Ex. A at p. 17. While the Court deemed the case "difficult" due to the circumstantial nature of the evidence, it detained Allen on danger-to-the-community grounds due to Allen's "propensity to violate the terms of his probation and the nature of the offenses previously committed by him, including a prior drug conviction and multiple convictions for assault and battery." See Ex. A at p. 18.

## Argument

This Court should not revoke the Magistrate Judge's carefully-crafted and balanced detention decision. The decision is supported by the statutory presumption in favor of detention,

the nature of the evidence against Allen, and his background and history of criminal conduct and anti-social behavior.

### Statutory Presumption Of DEtention

As observed by the Magistrate Judge, Allen neither produced nor proffered any credible evidence to rebut the presumption of detention set forth in 18 U.S.C. § 3142(e), which is squarely applicable to this drug case. "Without such evidence, the presumption alone may justify detention." Ex. A at p. 16. Accordingly, on that basis alone, this Court can and should affirm the Magistrate Judge's decision.

### Weight Of The Evidence

While the Magistrate Judge deemed the evidence of guilt "less than substantial," see Ex. A at p. 15, it is not as thin as Allen would have this Court believe. Indeed, the evidence clearly demonstrates that Allen was knowingly assisting Baldassano in the two large pill transactions in June 2004.

The First Circuit has held that knowing presence or association, as opposed to mere presence or association, at or with a drug deal is sufficient for liability.

> While "mere presence at the scene of the crime" or "mere association with conspirators" is not enough to establish guilt, the mere presence defense is not so ubiquitous as to envelop every drug-trafficking case in which the government lacks direct evidence of a defendant's complicity. Mere presence at the scene and close association with those involved are insufficient factors alone; nevertheless,

7

> they are *relevant* factors for the jury. As
> we repeatedly have recognized, a jury is free
> to rely on its common sense and may infer
> that criminal conspirators do not involve
> innocent persons at critical stages of a drug
> deal. Such is not normally the conduct that
> one would expect of conspirators engaged in
> conduct which by its nature is kept secret
> from outsiders.

United States v. Llinas, 373 F.3d 26, 32 (1st Cir. 2004) (affirming defendant's conspiracy conviction based on evidence that defendant transported co-defendants to the drug deal and handed two cellular telephone boxes to a co-defendant; drugs were secreted inside the boxes and were not visible; government's evidence was bolstered by defendant's false exculpatory explanation given during her testimony)(citations and internal quotations omitted). See also United States v. Carlos Cruz, 352 F.3d 499, 508 (1st Cir. 2003)(affirming defendant's aiding and abetting conviction where defendant's presence at a drug deal, while armed with a handgun, "suggests that he was present for the important purpose of protecting the money and the drugs" and thus that he "was more than merely present"); United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993)("[A] defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking."); United States v. Olivo-Infante, 938 F.2d 1406, 1409 (1st Cir. 1991)("the jury could reasonably have inferred that under these potentially dangerous circumstances, an insider rather than an outsider would chauffeur the dealer."); United

8

States v. Lema, 909 F.2d 561, 570 (1st Cir. 1990)("[P]resence on a single occasion may support a conviction for aiding and abetting if the surrounding circumstances lead to a reasonable inference that the defendant must have been a *knowing* participant.").

This Court, therefore, should not place any reliance whatsoever on predictions by Allen as to how this case will turn out. As Allen himself recognizes, there is no way to know at this juncture how this case will turn out. The Court needs no reminder that, in multiple-defendant cases, the government's evidence is often very different at the end of a case than it is the beginning of a case.

Allen's Background And Criminality

Allen is a 26-year old unemployed male who has a criminal history in Massachusetts dating back to 1992. A copy of his prior criminal record is attached hereto as Exhibit C. It reveals a picture of a dangerous man who is incapable of complying with society's rules or with probationary conditions similar to what Allen is asking this Court to impose. The government has attached hereto as Exhibits D-G copies of the Court records that it provided to the Magistrate Judge at the detention hearing.

In July 1996, Allen was convicted of malicious destruction of property (a felony) and assault and battery; the police report

9

reveals that this was a vicious assault on two males who had stopped to get coffee at a Dunkin' Donuts in Gloucester. Allen was sentenced to 18 months in the House of Correction, 10 days to serve and the balance suspended for two years. Allen was surrendered on two separate occasions for violating the terms of his probation.

While under the above sentence, Allen was charged in April 1997 with receiving stolen property and transporting alcohol as a minor. Four days later, he was charged with multiple counts of breaking and entering, malicious destruction of property, and larceny. While the latter case was dismissed, Allen was found guilty in the former case and was sentenced to 18 months in the House of Correction, later changed to one year probation. Again, Allen was surrendered for violating the terms of his probation.

While under both of the above terms of probation, Allen was charged in June 1997 with possession of marijuana and disorderly conduct. He was later convicted of these offenses and again sentenced to probation, which he again violated. He was convicted two more times of disorderly conduct in 1998, again while he was still on the earlier terms of probation.

From November 1999 through July 2002, Allen was arrested multiple times for assault and battery offenses causing serious personal injuries. He was convicted of these offenses and placed on probation, which he violated on numerous occasions. The

police reports and victim impact statement reveal a frightening picture of unprovoked beatings of persons for no discernible reasons.

On June 15, 2004, Allen was arrested for possession of marijuana. That case is still pending.

As the Magistrate Judge credibly determined, Allen has a series of convictions for crimes of violence and he has a documented history of being unable to follow probationary-type conditions. Indeed, Allen is a career offender whose pattern of criminality from 1996 to the present shows no signs of letting up.

## Conclusion

Based on the foregoing, the government respectfully requests that the Court deny Allen's motion and that it affirm the Magistrate Judge's detention order.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Michael J. Pelgro
Michael J. Pelgro
Assistant U.S. Attorney

DATED:    August 6, 2004.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

    James L. Sultan, Esq.
    Rankin & Sultan
    One Commercial Wharf North
    Boston, MA 02110

This 6th day of August 2004.

                                        _/s/ Michael J. Pelgro_
                                        MICHAEL J. PELGRO
                                        ASSISTANT UNITED STATES ATTORNEY